(No. 6198.   October 5, 1934.)

ROWLAND C. TAYLOR, Plaintiff, v. FRANKLIN GIR-ARD, Secretary of State of the State of Idaho, De-fendant.

[36 Pac. (2d) 773.]

James F. Ailshie, *in pro. per.*

Oppenheim & Lampert, Harry S. Kessler, Fred J. Babcock and L. E. Glennon, for Sam E. Blaine.

Eugene A. Cox, A. S. Hardy, Elbert A. Stellman, B. Auger and Bissell and Bird, *Amici Curiae.*

B. W. Davis, J. L. Eberle, A. A. Fraser, Hawley & Worthwine, Martin & Martin, and Frank T. Wyman, for Plaintiff.

BUDGE, C. J.—This is an original application for a peremptory writ of prohibition to prevent the Secretary of State from transmitting to the various county auditors the names of James F. Ailshie and Sam E. Blaine as the candidates to be voted for at the coming general election for the nonpartisan office of justice of the supreme court. A demurrer to, and a motion to quash, the petition were filed urging, among other things, that the court has no jurisdiction of the subject matter or of the action or of the person of the defendant. The cause was duly argued and voluminous briefs have been submitted, both for and against the granting of the peremptory writ. Due to the shortness of time before the holding of the general election it is a physical impossibility to consider and determine each and all of the questions raised and dismissed in the briefs of learned counsel whose arguments and briefs demonstrate

a desire to be of assistance to the court in a proper determination of the important question here for decision.

We are asked, notwithstanding the decision in *Koelsch v. Girard, ante,* p. 452, 33 Pac. (2d) 816, in which we held the act now under consideration to be constitutional and valid, to now hold that act to be unconstitutional and void, and to set aside a primary election for the reason that the various county auditors did not agree upon the instructions to the voter to be, and which were placed upon the primary ballot. Some counties instructed the voters on the ballot to vote for one. In other counties instructions were placed upon the ballot to vote for two, and, in some counties there were either no instructions or the instructions were so vague and uncertain as to constitute no instruction. There were four candidates and but one position to be filled, and but two to be nominated. The primary election has been duly and regularly held. The canvassing board of each county has certified the returns to the state canvassing board and the latter board has certified the names of James F. Ailshie and Sam E. Blaine to the Secretary of State, as being the duly nominated competing candidates for the office of justice of the supreme court to be voted for at the next general election.

We are first called upon to determine whether or not this is a case in which a peremptory writ of prohibition will issue.

The rule would seem to be that the prerogative writ of prohibition should be issued with forbearance and caution, and only in cases of necessity, and that such writ will not issue if there exist an adequate remedy otherwise. In *Little v. Broxon,* 31 Ida. 303, 170 Pac. 918, the following language is used:

"This court has repeatedly held that neither the writ of prohibition nor mandate, of which it is the counterpart, . . . . is available where a plain, speedy and adequate remedy at law exists." (*Olden v. Paxton,* 27 Ida. 597, 150 Pac. 40; *Lewis v. Mt. Home Co-op. Irr. Co.,* 26 Ida. 682, 156 Pac. 419; *Fraser v. Davis,* 29 Ida. 70, 156 Pac. 913,

158 Pac. 233; *New First Nat. Bank v. City of Weiser,* 30 Ida. 15, 166 Pac. 213; *Ex parte S. J. Jones,* 160 S. C. 63, 158 S. E. 134, 77 A. L. R. 235, and note; *State v. Superior Court,* 162 Wash. 377, 298 Pac. 716; *Hall v. Wittmeier,* 209 Ala. 355, 96 So. 327; *Pacific Mut. Life Ins. Co. v. Toler,* 187 Ark. 1073, 63 S. W. (2d) 839; *Halliburton v. Williams,* 166 Okl. 248, 27 Pac. (2d) 360; *Dunn v. Justice's Court,* 136 Cal. App. 269, 28 Pac. (2d) 690.)

"The writ of prohibition is never granted where there is any other legal remedy. *Hudson v. Preston,* 134 Ga. 222, 67 S. E. 800; *Turner v. Mayor etc. of Forsyth,* 78 Ga. 683, 3 S. E. 649." (*Wright v. Wood,* 178 Ga. 273, 173 S. E. 138.)

"Moreover, the writ of prohibition will never issue where there is another adequate remedy. *In re MacFarland,* 30 App. D. C. 365; *In re Rice,* 155 U. S. 396, 15 Sup. Ct. 149, 39 L. Ed. 198; *Alexander v. Crollott,* 199 U. S. 580, 26 Sup. Ct. 161, 50 L. Ed. 317." (*Poliszek v. Doak,* 57 Fed. (2d) 430, 61 App. D. C. 64.)

In *Kabadian v. Doak,* 65 Fed. (2d) 202, 62 App. D. C. 114, the court says:

"In *Bedford v. Wingfield,* 27 Gratt. (Va.) 329, the Supreme Court of Virginia said that the writ of prohibition 'issues only in cases of extreme necessity . . . . It is a principle of universal application, and one which lies at the very foundation of the law of prohibition, that the jurisdiction is strictly confined to cases where no other remedy exists, and it is always a sufficient reason for withholding the writ, that the party aggrieved has another and complete remedy at law.' "

The writ of prohibition will not issue even in case of encroachment, usurpation or abuse of judicial power or the improper assumption of jurisdiction, if there be an adequate and applicable remedy, by appeal, writ of error, *certiorari* or other method of review, available. (*Ex parte S. J. Jones, supra.*) The writ of prohibition is not favored and is issued with caution. (*State ex. rel. Poston v. District Court,* 31 Wyo. 413, 227 Pac. 378, 33 A. L. R. 1082.)

If there was another adequate remedy open to petitioners prior to the holding of the primary election, and if by resorting to such remedy the questions now sought to be raised could have been raised and determined, the writ should not issue. The case of *Koelsch v. Girard, supra,* was an action instituted prior to the primary election against the Secretary of State to compel the latter to file nonpartisan declarations of candidacy of Judges Koelsch and Winstead to be voted for at the primary election, it being the contention of the Secretary of State that the act here in question was unconstitutional and void, for which reason he refused to certify the names of said candidates to be placed upon the nonpartisan election ballot. The writ of mandate was issued and the names, not only of the candidates for the office of justice of the supreme court, but, also the names of all nonpartisan judicial candidates were placed upon the nonpartisan judicial ballot, to be voted for, and they were voted for at the primary election.

While it is true that the constitutionality of said act was not attacked upon the specific grounds now urged, if the act is subject to attack for the reason or reasons now urged by petitioner, it was subject to the same attack at the time this court considered the case of *Koelsch v. Girard, supra.* (*McEntire v. Williamson,* 63 Kan. 275, 65 Pac. 244.) The same ambiguities, the same uncertainties, the same lack of uniformity now complained of existed then, and at all times subsequent to the passage of the act by the legislature and the signature of the Governor attached thereto. When the declarations of candidacy of the respective judicial candidates were filed with the Secretary of State the act was subject to the same attack that is now being made upon it, but no effort was made and no proceedings were had to enjoin the Secretary of State from certifying to the county auditors the names of the respective candidates for judicial offices, on the ground that the act was unconstitutional and void. Neither was a proceeding in *mandamus* or any other action instituted for the purpose of having the court determine what, if any, instructions to voters should

be placed upon the primary ballot. The Secretary of State is an executive officer and if he should refuse to do what he ought to do *mandamus* may reach him, and if he should attempt to do what he ought not to do he is amenable to injunction. We do not wish to be understood as saying that this was the specific remedy or the one remedy which should have been followed, but if there was any remedy at law or otherwise, and we think there was, whereby the questions now sought to be raised could or should have been raised prior to the primary election the writ should not issue. In support of the position above taken it would seem that the case of *State ex rel. v. Jepsen,* 46 Nev. 193, 209 Pac. 501, is in point. It would seem obvious that had the petitioners in *Koelsch v. Girard, supra,* remained silent and permitted their names to be certified down to the county auditors to be placed upon the partisan ballot and an election held, that they could not now be heard to say that the election was void and that their names should have been placed upon the nonpartisan judicial ballot.

Did the petitioner, by voting in the primary election without objecting to or questioning the validity of the act now involved, thereby availing himself of the privileges and benefits of said act, waive his right to question the validity of the act after the primary election was held? It may be conceded that the authorities are not uniform upon this question. We question, however, the soundness of the doctrine that plaintiff, after failing to question the instructions to voters placed upon the ballot, and after failing to raise objections to the act involving its constitutionality, and having himself participated in the election, can now raise the issue as to the correctness of the instructions so placed on the ballot or the invalidity of the act, he having waived his right so to do. It would seem that petitioner has placed himself within the rule announced in *Brady v. Place,* 41 Ida. 747, 242 Pac. 314, 243 Pac. 654, wherein it is held that a party seeking to enforce a statute or to avail himself of its provisions may not question its constitutionality. Petitioner sought to avail himself of the provisions of the act.

While it may be true that the rule announced in *Baker v. Scott*, 4 Ida. 596, 43 Pac. 76, construing I. C. A., section 33–807, is not an adequate remedy in a situation such as we have before us, the principle of law therein announced would seem to be sound, namely: That if the petitioner had an opportunity under the law to have had any of the alleged errors in the ballot corrected, or an opportunity to question the constitutionality of the act upon any ground, before the election, having neglected to avail himself thereof, he cannot now be heard to urge such objections, when their recognition would avail, not only to defeat the express will of the voters, but to disfranchise thousands of legal voters.

In *McGrane v. County of Nez Perce*, 18 Ida. 714, 112 Pac. 312, Ann. Cas. 1912A, 165, 32 L. R. A., N. S., 730, this court, quoting with approval from *In re Town of Groton*, 63 Misc. 370, 118 N. Y. Supp. 417, said, as follows:

"It cannot be the purpose of the law to afford an opportunity for those interested in the results to proceed to a vote and count, without objection or protest, and then, when the result is adverse to their wishes, to give them another chance upon a palpable error which could have been corrected had they called attention to it; but, aside from the absurdity of such a holding, the principles enunciated in *People ex rel. Hirsh v. Wood*, 148 N. Y. 142, 42 N. E. 536, are applicable to this proceeding and sufficient to require a denial of this application. It is there said (page 146 of 148 N. Y., page 537 of 42 N. E.): 'We can conceive of no principle which permits the disfranchisement of innocent voters for the mistake or even wilful misconduct of election officers in performing the duty cast upon them.' . . . . It is not difficult to say in advance of their action what they should have done and should not have done. The law is clear, and it was the unmistakable duty of the officers to follow its mandates, but we are now confronted with a condition and not a theory. They have acted, and the election has been held. The electors have cast their votes. The electors have already been subjected to the predicament of casting their votes under circumstances which at least ren-

dered it possible for the secrecy of their ballots to be invaded. . . . . After all these things have occurred, the question arises as to whether the court shall visit the results and penalties of the negligence or wrongfuldoing of the election officers upon the innocent electors and declare their votes illegal and the election void, and thereby rob the people of their right to suffrage until the time arrives for another election. The question is simply reduced to this; shall the electors be visited with two invasions of their rights instead of one. Shall they be deprived of the right of suffrage for the time being because their officers have acted negligently or wrongfully in the preparation of ballots, or shall the election be sustained and the penalties, if any, be visited upon the parties responsible for the errors or wrongs which have been committed. . . . . Under the law of this state, a general election can only be held biennially, and so if it is not held on the day fixed by law, there will be no other general election for two years thereafter, and in the meanwhile the old officers will hold until their successors are elected and qualified. . . . . Two wrongs will no more make a right in law and government than in morals. To follow up the wrongful preparation of ballots with setting aside the election would only be adding another injury to an already outraged electorate."

Conceding that the various county auditors, lawfully or otherwise, caused instructions to be placed upon the ballots which were conflicting and not uniform throughout the state, and thereby certain electors were misled and did not vote their full strength, or if certain electors were permitted under the instructions to vote in excess of their voting strength, and others voted only their voting strength, would we be justified in setting aside the election and disqualifying the thousands of electors who did vote their full voting strength and the thousands who voted only a part of their voting strength, and should we visit upon the electors the penalty of disfranchisement, particularly in view of the fact that the names of all candidates appeared upon the judicial

ballot and all candidates' names were before the electors from which to choose, it being necessary that there should be double the number of candidates nominated for the one position to be filled? It would seem to be the general rule that the voter should not be deprived of his rights as an elector, nor disfranchised, by the errors, wrongful acts, fraud or mistakes of election officers, if it is possible to prevent it (*Pickett v. Board of County Commissioners,* 24 Ida. 200, 133 Pac. 112; *Huffaker v. Edgington,* 30 Ida. 179, 163 Pac. 793; *Jaycox v. Varnum,* 39 Ida. 78, 226 Pac. 285; *McGrane v. County of Nez Perce, supra; People v. Wood,* 148 N. Y. 142, 42 N. E. 536), and, that where there is a neglect on the part of one to avail himself of a right to call upon the courts to compel the legal and proper performance of the duties imposed upon election officials, he cannot, when the result of the election is announced and he finds his candidate defeated, ask the court to nullify the expressed will of the voters, for a reason which he could by reasonable diligence have had corrected prior to the primary election.

"The rule is apparently well settled that, where a party fails to take any steps to correct errors in the ballot, he cannot after being defeated at the polls, be heard to complain of error in the ballots, which he had knowledge of and might have corrected prior to the election. *Sawin v. Pease,* (6 Wyo. 91) 42 Pac. 750; *State v. Stein,* 35 Neb. 848, 53 N. W. 999; *Baker v. Scott,* (4 Ida. 596), 43 Pac. 76; *Bowers v. Smith,* 111 Mo. 45, 20 S. W. 101 (16 L. R. A. 754), 33 Am. St. 491; *Allen v. Glynn,* 17 Colo. 338, 28 Pac. 670 (15 L. R. A. 743), 31 Am. St. 304; *Stackpole v. Hallahan,* 16 Mont. 40, 40 Pac. 80 (28 L. R. A. 502).

"The fact that the case grew out of a general election while the present one grows out of a primary election makes no difference. Both are elections within the rule." (*People v. Wood, supra; State ex rel. Brooks v. Fransham,* 19 Mont. 273, 48 Pac. 1; *State ex rel. Curtiss v. Superior Court,* 140 Wash. 518, 249 Pac. 274; *Martin v. McGarr,* 27 Okl. 653, 117 Pac. 323, 38 L. R. A., N. S., 1007; *Atkinson v. Roose-*

*velt County,* 71 Mont. 165, 227 Pac. 811; *Nance v. Kearbey,* 251 Mo. 374, 158 S. W. 629, 631.)

The writ will not issue.

Justice Givens concurs in the conclusion that the writ should not issue.

MORGAN, J.—The first question which should be decided in this case may be stated as follows: Is the writ of prohibition available as a remedy to prevent the Secretary of State from performing a clerical, ministerial act which the law has made it his duty to perform?

I. C. A., section 33–636, made it a duty, which has been performed by the state board of canvassers, to certify the nominees to the Secretary of State. It is:

"For the purpose of canvassing the results of the nominating election as herein provided, the state board of canvassers shall meet at the office of the secretary of state at ten o'clock in the forenoon of the eleventh day after the nominating election and said board shall canvass the votes for candidates for United States senator, representatives in congress, state and district offices, and shall certify the nominees of the different parties therefor to the secretary of state, not less than thirteen days after the nominating election."

I. C. A., section 33–645, commands the act here sought to be prohibited. It provides:

"Not less than thirty days before an election to fill any public office, the secretary of state shall certify to the county auditor of each county within which any of the electors may by law vote for candidates for such office, the name and description of each person nominated for such office, as specified in the certificates of nomination filed with the secretary of state."

The duty of the county auditor with respect to the preparation of the ballot is prescribed by the same section, as follows:

"As soon as the county auditor shall have received the information required to be certified to him by the secretary

of state, as provided in the section next preceding, it shall be his duty to compile in ballot form the information contained in said certificate . . . . ''

*Miller v. Davenport*, 8 Ida. 593, 70 Pac. 610, was a case wherein writ of prohibition was sought to prohibit a county auditor from placing upon the official ballot the name of a candidate for district judge which had been certified to him by the Secretary of State. The court said:

"This contention is not well founded. County auditors, so far as arranging the official ballots are concerned, act in a clerical capacity, and are not clothed with judicial or *quasi* judicial power. It is the duty of county auditors to place upon the official ballot, in the proper column, the names of the candidates for the different offices who have been nominated, and whose nomination has been duly certified in accordance with the provisions of our election laws. They have no discretion in the matter. They cannot go behind the certificates of nomination and inquire into the eligibility of candidates. With that they have nothing to do. This being true, it is apparent that the writ demanded must be denied, for the reason that this court cannot, by writ of prohibition, prohibit the county auditor from doing that which it is his clerical duty, under the election laws, to do."

That language is equally applicable to this case wherein it is sought, by writ of prohibition, to prevent the Secretary of State from performing a clerical act exacted of him by law.

A limitation of the writ of prohibition, in cases of this kind, is indicated by the language of our statute defining it, as follows:

13-401. "The writ of prohibition is the counterpart of the writ of mandate. It arrests the proceedings of any tribunal, corporation, board or person, when such proceedings are without or in excess of the jurisdiction of such tribunal, corporation, board or person."

In saying "the writ of prohibition is the counterpart of the writ of mandate" it is not to be understood the legislature meant prohibition to prevent all acts, when wrongfully

threatened, which mandate might compel, when wrongfully refused, but only such as involve the element of jurisdiction. The purposes for which the writ of mandate may be used are pointed out in section 13–302, as follows:

"It may be issued . . . . to any inferior tribunal, corporation, board or person, to compel the performance of an act which the law especially enjoins as a duty resulting from an office, trust or station; or to compel the admission of a party to the use and the enjoyment of a right or office to which he is entitled, and from which he is unlawfully precluded by such inferior tribunal, corporation, board or person."

The element of jurisdiction, or lack of it, is not present in the statute providing the uses to which *mandamus* may be put, while it is one of the indispensable elements in case of prohibition.

The use of the word "jurisdiction" in section 13–401 is not to be disregarded. It is said in Black's Law Dictionary, third edition, page 1442:

"Prohibition may, where the action sought to be prohibited is judicial in its nature, be exercised against public officers. *State ex rel. United States Fidelity & Guaranty Co. v. Harty*, 276 Mo. 583, 208 S. W. 835, 838."

It is doubtful if a definition of prohibition can be found anywhere broad enough to include any act of the secretary of state sought to be prohibited in this proceeding. In 22 R. C. L., page 15, section 13, it is said:

"Except in those cases where some valid constitutional or statutory enactment declares directly to the contrary, it must appear that the act in question is not ministerial in character. If it is ministerial, the writ cannot be sustained, though the person or tribunal against which it is sought is a judge or court authorized in proper cases to discharge judicial functions."

In 50 C. J. 654, section 3, it is said:

"Prohibition, at common law, was a remedy against encroachment of jurisdiction. Its office was to restrain subordinate courts and inferior judicial tribunals from extend-

ing their jurisdiction. In adopting the remedy the courts have almost universally preserved its original common-law nature, object, and function. Thus, while the office of the remedy is in some jurisdictions enlarged or restricted by constitutional or statutory provisions, as adopted in most jurisdictions, its proper function is to prevent courts, or other tribunals, officers, or persons, from usurping or exercising a jurisdiction with which they are not vested by law, and to confine them to the exercise of those powers legally conferred. Where a constitution or statute confers authority to issue the writ of prohibition, without using other terms enlarging or restricting the office of the writ, the writ of prohibition as known to the common law without extension or enlargement of its scope is meant.

"It has been held, however, that a constitutional provision authorizing the grant of prohibition is to be construed with reference to the scope of the writ as recognized in the particular jurisdiction at the time of its adoption."

In *Williams v. Lewis*, 6 Ida. 184, 54 Pac. 619, our court granted a writ prohibiting the secretary of state from certifying to the county auditors nominations to state offices of candidates attempted to be nominated by a branch, or faction, of the people's party. The question here under consideration was presented to the court in that case. It is said in the opinion:

"The demurrer to the complaint for a writ of prohibition is urged upon the ground that such writ is sought to prevent or prohibit the act of an official purely ministerial in its character; and this contention is supported by several decisions of the supreme court of California, from which state our statute upon the subject was taken."

Our court refused to follow the California decisions and issued a peremptory writ of prohibition. That decision was overruled in *Stein v. Morrison*, 9 Ida. 426, 453, 75 Pac. 246, 255, wherein the court said:

"In this connection the question has been directly and specifically raised as to whether or not under the constitution and laws of this state the writ of prohibition will issue to

enjoin the commission of ministerial and administratve acts. In support of the position that the writ will issue in such case, we are cited to *Williams v. Lewis,* 6 Ida. 184, 54 Pac. 619, where this court said: 'The writ of prohibition, under the statutes of Idaho, will lie to restrain the action of a ministerial officer when it appears that such action is illegal and beyond his jurisdiction.' Counsel for defendant contend that this case is contrary to the great weight of authority announced in nearly every other state in the Union, and ask us to overrule it in so far as it announces the doctrine above quoted. After careful examination of that case and the pleadings which were before the court, it seems to us that the doctrine announced to the effect that the writ would lie to restrain the action of ministerial officers was unnecessary to a determination of the issues involved and to that extent is *dictum.* The question there involved was the filing and certifying by the Secretary of State two separate tickets presented to him by two distinct political organizations, each representing itself to be the 'People's Party.' Under the law the secretary could not file and certify but one ticket in the name of any one political party. He was therefore in that case called upon to exercise *quasi* judicial functions and determine which of the two tickets was the ticket nominated by the real, genuine, accepted 'People's Party.' When we call to mind the distinguished and able judges who constituted the court when *Williams v. Lewis* was decided, we feel some reticence in a reexamination of the question there discussed, but the conclusion announced as to the office of the writ as contemplated under the constitution is in such apparent conflict with the great weight of authority that we have deemed ourselves justified in making an original investigation of that question. Section 9, article 5 of the constitution provides that: 'The supreme court shall also have original jurisdiction to issue writs of *mandamus, certiorari,* prohibition and *habeas corpus.'* This provision seems to have been taken literally from section 4 of article 6 of the constitution of California The same provision was contained

in the constitution of California as adopted in 1849 and again as adopted in 1862, and was finally readopted in the constitution of 1879. The legislature of California in defining the writ of prohibition, at section 1102, Code of Civil Procedure, used the identical language which was copied by our legislature and adopted as section 4994 of our Revised Statutes. The supreme court of California, in considering the extent and scope of the writ as used in the constitution and statutes of that state, held uniformly that the common-law writ was meant.

"In *Maurer v. Mitchell*, 53 Cal. 289, the court considered the statutory definition of the writ and the language used in that connection, and construed it in such a clear and convincing way, that we quote at length from that opinion. It says:

" 'Giving the words of the last clause of the section their natural construction in view of the law when the section was adopted, there would be no difficulty in holding that the "corporation, board or person" mentioned was a corporation, board, or person clothed with limited *judicial* powers which had been exceeded. The word "jurisdiction," when used in connection with "prohibition," would be at once understood as being employed in the sense of the legal power or authority "to hear and determine causes." It is said, however, that the first clause of the section can only be given effect by extending prohibition so as to arrest every unauthorized act of an officer or person clothed with authority, as *mandamus* may be employed to compel the performance of any act enjoined by law, with the condition in each case that the party has no other plain, speedy and adequate remedy. But that prohibition as a remedy is not in every respect the exact converse of *mandamus* is made apparent by the words of the second clause of the same section, which declare that prohibition arrests proceedings which are without or in excess of the jurisdiction. In prohibition it must be shown to the court that the inferior court or person *has* exceeded the powers conferred by law, and the court intervenes to prevent further proceedings without or in excess of such

power. *Mandamus* may be resorted to whenever an officer or person refuses to perform a duty enjoined by law, although the act may have been an isolated one, disconnected with any proceedings leading up to that which the recalcitrant official or individual refused to perform.

" 'In what sense, then, is the word "counterpart" employed in the first clause of the section? As it cannot be given the meaning of the exact reverse or opposite without doing away with the limitation contained in the second clause, whereby prohibition is confined to the cases in which the court, corporation, officer, or person has already exceeded the powers conferred by law, it must have been used in the more general sense, that prohibition is the opposite, in that it *arrests* while *mandamus commands* action.

" 'The word "counterpart" as employed in the statute is designed to illustrate the operation of the writ or prohibition when issued in a proper case, but it is not intended to enlarge or add to the class of cases in which it may be resorted to.'

"In defining the writ at section 4994 Revised Statutes, (I. C. A., sec. 13-401), it is said that 'it arrests the *proceedings*' when they are 'without or in excess of the *jurisdiction*' of the tribunal, corporation, board or person about to exercise the *jurisdiction*. Jurisdiction, as used in the law, is the right to hear and determine a matter and carries with it the idea of exercising judicial or *quasi* judicial functions. (See 'Jurisdiction,' Black's Law Dictionary; Bouvier's Law Dictionary, and authorities there cited.) The word '*proceedings*' as here used cannot reasonably be said to apply or have reference to the doing of a purely ministerial act.

"In 1881, and after the decisions reported in the 52d and 53d Cal. had been announced the legislature of California amended section 1102 of their Code of Civil Procedure by adding thereto the words 'Whether exercising functions judicial or ministerial.' In *Camron v. Kenfield*, 57 Cal. 550, the court held that the amendment was unconstitutional, for the reason that the word '*prohibition*' had been used in the constitution in the common-law sense of that

term, and that it was beyond the power of the legislature to extend the scope of the writ by legislative definition. This last case seems to have become the settled doctrine in that state and has been repeatedly cited with approval, not only by the courts of that state, but by the highest courts of other states, and it is clear to us that the reasoning of the case and the principle there announced was misapprehended and misapplied in *Williams v. Lewis*. In the Williams case the court seems to have taken the view that under sections 4994 and 4995, Revised Statutes (I. C. A., secs. 13–401 and 13–402), the territorial legislature had extended the scope and province of the writ, and in support of that position cites section 1866 of the Revised Statutes of the United States, which provided that the original and appellate jurisdiction of the territorial courts should be *limited* by law. When the act of Congress provided that the jurisdiction of the territorial courts should be *limited* by law, it was certainly not the intention to authorize the *extension* of the use of the writ of prohibition within the territorial jurisdiction beyond in excess of the scope and power of the writ as uniformly recognized by the federal courts.

"At common law the writ of prohibition was issued on the suggestion that the cause originally, or some collateral matter arising therein, did not belong to the inferior jurisdiction, but to the cognizance of some other court. 'It was an original remedial writ provided as a remedy for encroachment of jurisdiction; its office was to restrain subordinate courts and inferior judicial tribunals from extending their jurisdiction.' (3 Shars. Blackst. Com. 112; *Quimbo Appo v. People*, 20 N. Y. 540; *Thomas v. Mead*, 36 Mo. 232; *Spring Valley W. W. v. San Francisco*, 52 Cal. 117; *Maurer v. Mitchell*, 53 Cal. 291.) Now, the question arises: With the federal courts using the writ in its common-law sense and the supreme court of California holding that the word 'prohibition' as used in the constitution and statutes of California had been used in the common-law sense, in what sense shall we conclude that the framers of the Idaho constitution used the word '*prohibition*' when incorporating the same

into the organic law of this state? When a statutory or constitutional provision is adopted from another state, where the courts of that state have placed a construction upon the language of such statute or constitution, it is to be presumed that it was taken in view of such judicial interpretation and with the purpose of adopting the language as the same had been interpreted and construed by the courts of the state from which it was taken.

"We therefore arrive at the contrary conclusion from that reached in *Williams v. Lewis,* and are of the opinion that the writ of prohibition as authorized by the constitution is the common-law writ, and that the same will not issue to restrain purely ministerial acts. The case of *Williams v. Lewis* is therefore expressly overruled in so far as it holds that the writ of prohibition will lie to restrain ministerial acts." (See, also, *State v. Railroad Commrs.,* 79 Fla. 526, 84 So. 444; *State v. Blegen,* 26 S. D. 106, 128 N. W. 488; *State v. Vaughn,* 33 Okl. 384, 125 Pac. 899.)

The following statement is found in *State v. Leonardson,* 51 Ida. 646, 658, 9 Pac. (2d) 1028, 1033:

"This proceeding invokes the extraordinary legal remedy of prohibition, and is directed against the assessor and members of the board of county commissioners of Ada County. We are asked to *prohibit* these defendant officials from assessing and taxing the shares of this relator, which we have held to be properly assessable and taxable under the law. Under the express provisions of our statutes (C. S., secs. 7267, 7268) (I. C. A., secs. 13–401, 13–402) as repeatedly construed by this court (citing *Stein v. Morrison* and other cases) in such a proceeding as this there are only two matters to be considered by us: (1) Did the defendants act without or in excess of their juridiction? (2) Did plaintiff have a plain, speedy and adequate remedy in course of law? Our primary inquiry is directed to the jurisdiction of the defendant officers to act. It cannot be said that they were acting *without or in excess* of their jurisdiction in assessing relator's shares. Rather, the complaint is that they were about to perform duties enjoined upon them by

statute, in the doing of which they are vested with sole and exclusive jurisdiction, and it is obvious that we cannot *prohibit* officers from doing their duty. (50 C. J. 681, sec. 53; *State v. Denney,* 150 Wash. 690, 274 Pac. 791.)''

It has been urged that *Balderston v. Brady,* 17 Ida. 567, 107 Pac. 493, *Adams v. Lansdon,* 18 Ida. 483, 110 Pac. 280 and *Perrault v. Robinson,* 29 Ida. 267, 158 Pac. 1074, are in conflict with *Stein v. Morrison,* wherein it overruled *Williams v. Lewis.*

In *Balderston v. Brady* it was sought, by writ of prohibition, to prevent the state board of land commissioners from relinquishing the right and title of the state to certain land selected by it from the public domain of the United States, to settlers who claimed a prior right to it, which claim had been rejected by the Secretary of the Interior. As will be seen from an examination of the contentions of counsel in that case, set forth in 17 Ida. 568–570, 107 Pac. 493, the case was commenced on the theory that ''the threatened action of the state land board is of *quasi*-judicial nature.'' Defendants did not dispute this, but urged that their demurrer to the complaint should be sustained because ''a writ of prohibition will not lie against the governor or an executive body of which the governor is a member.'' *Amici curiae* advanced the theory that ''the writ of prohibition will lie to restrain encroachment of jurisdiction, but not to control the exercise of a discretion legally invested.'' Also that ''this court has no legal jurisdiction to control, either by prohibition, *mandamus* or injunction, the discretionary powers of the state land board.'' The court held while, ''as stated in *Stein v. Morrison, supra,* it is held by many authorities that the writ of prohibition will not lie against the governor of the state to restrain him from performing an executive act'' (17 Ida. 576, 107 Pac. 493, 495), that when he is acting and voting as a member of the state board of land commissioners he is not acting as chief executive and the writ, if issued, would run against the board and not against the governor.

In *Adams v. Lansdon* the sufficiency of the complaint was challenged by general demurrer, and the applicability of prohibition was not called in question, decided nor in any manner referred to.

' *Perrault v. Robinson* was intended to, and did, prevent the mayor and members of the city council of Boise from holding an illegal, unauthorized, invalid election, which would have been to the detriment and injury of appellant and other taxpayers, which threatened· act on their part was not clerical nor ministerial, but involved the making of a *quasi*-judicial decision.

Neither of these cases conflicts with *Stein v. Morrison.*

In *State v. Johnston,* 234 Mo. 338, 137 S. W. 595, a writ of prohibition was sought against the secretary of state and others to prevent him from revoking the license of a foreign corporation to transact business in Missouri pursuant to a statute purporting to require him to do so. The writ was sought on the theory that the act of the legislature directing the secretary of state to revoke the license, under the circumstances stated in the case, was unconstitutional. While the proceeding was pending the supreme court of the United States, in another case, held the act of the legislature to be unconstitutional, which decision the Supreme Court of Missouri concurred in, and said:

"The act having been declared unconstitutional, it remains now for this court to decide whether, at the time of filing the petition herein, the relator, under the showing made in its petition, was entitled to a writ of prohibition. Unquestionably, if the relator's rights were threatened under the pretext of an unconstitutional act, it was entitled to judicial protection in some form; but the question is, was it entitled to a writ of prohibition?"

With respect to the claim of right to the writ of prohibition against the secretary of state, and denying it, the court said:

"Can the writ of prohibition go against the Secretary of State? He is an executive officer; and if he should refuse to do what he ought to do a *mandamus* may reach him, or, if he should attempt to do what he ought not do, he is

amenable to injunction, but he is amenable to a writ of prohibition only, if at all, when he assumes to exercise a judicial function.

"A ministerial officer has no right to pronounce an act of the General Assembly unconstitutional and so disobey it. The power to declare a statute enacted by the law making department of the state unconstitutional is entrusted only to the judicial department of the state government; is not only judicial in character, but it is of the highest judicial character."

Although, in the Missouri case, the law pursuant to which the secretary of state threatened to act was held to be unconstitutional, the court decided a writ of prohibition would not issue to prevent him from acting. In this case no contention is made that the law which commands the secretary of state to act is unconstitutional. It appears to be conceded that the law makes it his duty to certify to the county auditors the names of nominees which the state board of canvassers has certified to him.

This brings us again face to face with the question as to whether this court can be called upon to prohibit an officer, acting in a clerical, ministerial capacity, from doing that which the law commands him to do. The answer must be in the negative. Other questions sought to be presented are not properly before the court. The writ should be denied and it is so ordered.

Honorable Wm. A. Babcock, District Judge, who sat with the court in this case, authorizes me to say he concurs in the views herein expressed.

HOLDEN, J., Dissenting.—The opinions filed in this case present a rather novel situation. Mr. Justice Morgan concludes that a writ of prohibition will not issue to prohibit the performance of a ministerial act, whether the act be one commanded by law, or one without authority of law; in which conclusion Honorable William A. Babcock, District Judge, concurs. On the other hand, Mr. Chief Justice Budge holds to the view that the plaintiff waived his right to prosecute this case, and, therefore, to have it heard upon its merits,

by waiting until after the primary election. Mr. Justice Givens merely concurs in the *conclusion* that the writ ought not to issue. In other words, Mr. Justice Givens does not agree with either Mr. Justice Morgan, or Mr. Chief Justice Budge, so that a majority of this court do not hold either that a writ of prohibition will not issue to prohibit the performance of a purely ministerial act, or that plaintiff waived his right to prosecute this case by waiting until after the primary election.

It is my view that a writ of prohibition will issue to prohibit the performance of a ministerial act, which is without authority of law, and that plaintiff, Taylor (an elector of this state), did not waive his right, by waiting until after the primary election, to prosecute his action for the issuance of a writ of prohibition, and that this case ought to be decided upon its merits, in order that this court might determine, one way or the other, either that chapter 16, 1933 Sess. Laws, is clear, definite and certain, and the election held under it valid, or that it is uncertain and indefinite, instead of disposing of the case upon collateral questions, as the majority opinion does, thus refusing to determine the case upon its merits.

On grounds of public policy, an elector cannot waive his right to question the validity of a statute, to wit, chapter 16, 1933 Session Laws. (*State ex rel. Birchmore v. State Board of Canvassers*, 78 S. C. 461, 59 S. E. 145, 13 Ann. Cas. 1133, 14 L. R. A., N. S., 850, and cases cited in the note; 9 R. C. L. 1174; 10 R. C. L. 833; 27 R. C. L. 906.) And a party participating in an election does not deprive himself of his right to question its validity. It seems clear that voting at an election could not have the effect of making an invalid statute, valid, nor a valid statute, invalid. (*City of Lebanon v. Humkey*, 161 Ky. 454, 170 S. W. 1172; *Elliott v. Burke*, 113 Ky. 479, 68 S. W. 445.)

The opinion of Mr. Justice Morgan, holding that a writ of prohibition will not lie to prohibit the performance of a ministerial act, is based on *Stein v. Morrison*, 9 Ida. 426, 75 Pac. 246. In that case prohibition was sought to prohibit the issuance and sale of state bonds, authorized by

certain acts of the legislature, on the ground that the legislature had made an appropriation in excess of the tax levy, in violation of section 11, article 7, of the state Constitution, prohibiting the legislature from making an appropriation whereby expenditures during any fiscal year would exceed the total tax provided by law, and upon the further ground that the appropriations and expenditures authorized by the legislature, added to prior and existing liabilities and debts, exceeded the debt limit of one and one-half per cent of the total assessed valuation of property in the state, contrary to the provisions of section 1, article 8, of the state Constitution.

This court held in that case that the appropriations made and authorized, did not exceed the debt limit prescribed by the Constitution, and that the petition did not, therefore, state facts sufficient to entitle Stein to the relief prayed for, to wit, a writ of prohibition, which most effectually disposed of the entire controversy. Consequently, that part of the opinion (upon which Mr. Justice Morgan relies), discussing the circumstances under which a writ of prohibition would, or would not, issue, and stating that the writ would not issue to restrain a purely ministerial act, is mere *dictum*, because that case had been fully disposed of by the holding of the court that the complaint was wholly insufficient; and, therefore, the rule announced by this court in *Williams v. Lewis*, 6 Ida. 184, 54 Pac. 619 (decided in 1898), is still the law of this state. In the last-mentioned case this court held that "a writ of prohibition, under the statutes of Idaho, will lie to restrain the action of a ministerial officer, when it appears that such action is illegal and beyond his jurisdiction; as the Secretary of State, in certifying to the county auditors a ticket not entitled to be certified."

In *Balderston v. Brady*, 17 Ida. 567, 107 Pac. 493, Balderston sought a writ of prohibition against Governor Brady restraining threatened action of the State Land Board in releasing title to certain lands in Shoshone county. Balderston relied upon the authority of *Stein v. Morrison, supra.* This court held that it would not attempt to control or

direct the action of the Land Board *so long as its discretion was exercised within the scope of its authority,* but that ''where, on the other hand, the proposed or contemplated action is without authority of law, or has no legal sanction, the courts may interfere and interrupt their action and *declare the law on the subject,* and point out to them the legal scope within which their judgment and discretion is to be exercised.'' (Italics mine.)

Judge Ailshie, the author of the opinion in *Balderston v. Brady, supra,* in the course of analyzing the holding of this court in *Stein v. Morrison, supra,* states that ''It is doubtful if anyone would seriously contend that the process of the courts *will not run against an individual, or individuals, holding an executive office or offices* or comprising an executive board, *simply because they occupied such official position* and were assuming to act as officials, although their action was *beyond the scope of their authority and wholly unauthorized by law. We do not hold such a position tenable, and have never so held.''* (Italics mine.)

It appears, therefore, that this court, in the case of *Balderston v. Brady, supra* (relied upon by Mr. Justice Morgan), clearly held that, notwithstanding the case of *Stein v. Morrison, supra, any act of an executive officer, beyond the scope of his authority, and unauthorized by law, would be restrained, and stating that this court had never held anything to the contrary.* And, it must be remembered, that Judge Ailshie wrote the opinion of this court in *Stein v. Morrison, supra,* as well as the opinion in *Balderston v. Brady, supra,* and, therefore, must have understood, better than anyone else could understand, just what this court intended to hold, and actually did hold, in *Stein v. Morrison.*

In *Perrault v. Robinson,* 29 Ida. 267, 158 Pac. 1074, Mr. Justice Morgan, the author of the majority opinion in that case, says: ''The question here is not, as in most of the cases cited, may an election which is provided for by law be restrained, but is, have the mayor and council of Boise jurisdiction to call an election which is unauthorized by law and thereby involve the taxpayers of that city in a useless expense of approximately $1,000.'' In other words, the ques-

tion in that case was: whether an election, unauthorized by law, would be restrained. The majority of the court, in the Perrault case, held that an election, unauthorized by law, could be restrained. Perrault sought a writ of prohibition to restrain the mayor and city council of Boise from submitting to a referendum vote a certain ordinance of that city. The gist of that action was to prohibit the mayor and city council from holding an election, which Perrault contended was not authorized by law. In principle, and as a matter of law, it could make no difference whether it was a city council, or a Governor or a Secretary of State, that was threatening action looking toward the holding of an election. The only question would be as to whether the law authorized the holding of the threatened election, because it at once becomes clear that this court would not prohibit a city council from calling and holding an election not authorized by law, and then, and in another case, refuse to prohibit a Governor, or a Secretary of State, for example, from taking action looking toward the calling of an election, if such threatened election was not authorized by law. And that Mr. Chief Justice Sullivan took the view that an executive officer, even a Governor, could be prohibited from calling an election, if the election was unauthorized by law, is made clear from the expression of his views, contained in his special concurrence, as follows:

"If it be held that the holding of an election that is not authorized by law cannot be enjoined or prohibited in any manner by any writ from any court, then the Governor of this state might call a general election for the first day of July, or for any other time than the date authorized by law, and there would be no power whatever to restrain him from so doing, and the people of the state would thus be put to an expense of at least $100,000, the amount estimated that the holding of a state election would cost the taxpayers of this state."

Of course, the amount of the expense involved in holding an election could not determine, or have the slightest effect upon, the matter of conferring jurisdiction upon this, or

any, court. Jurisdiction, it is universally conceded, is conferred upon courts by law, and not, for example, by the amount of expense involved in holding any kind of an election.

Mr. Chief Justice Budge, in his opinion in this case, states that: "We are asked, notwithstanding the decision in *Koelsch v. Girard, ante,* p. 452, 35 Pac. (2d) 816, in which we hold the act now under consideration to be constitutional and valid, to now hold that act to be unconstitutional and void, and, to set aside a primary ·election for the reason that the various county auditors did not agree upon the instructions to the voter to be, and which were, placed upon the primary ballot." In that case, this court was not called upon to, nor did it decide, that chapter 16, 1933 Sess. Laws, was or was not so indefinite and uncertain as to render it invalid, so that case cannot be relied upon as an authority in this case.

Mr. Chief Justice Budge also discusses, at some length, the state-wide conflict among county auditors in the matter of giving instructions to voters, and in that connection states: "Would we be justified in setting aside the election and disqualifying the thousands of electors who did vote their full voting strength and the thousands who voted only a part of their voting strength, and should we visit upon the electors the penalty of disfranchisement, particularly in view of the fact that the names of all candidates appeared upon the judicial ballot and all candidates' names were before the electors from which to choose, it being necessary that there should be double the number of candidates nominated for the one position to be filled?"

I do not express an opinion as to whether this court would, or would not, be justified in holding chapter 16, 1933 Sess. Laws, invalid, and thereby set aside the election for the nomination of candidates for judicial offices, because a majority of this court, by their ruling and decision, have made it impossible to consider that question, or this case upon its merits, or to determine whether such primary election was valid or invalid.